**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Cindy M. Magelky, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR PARTIAL** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| BNSF Railway Company, a | ) | |
| Corporation, | ) | |
| | ) | Case No. 1:06-cv-025 |
| Defendant. | ) | |

Before the Court is the Plaintiff's "Motion for Partial Summary Judgment," filed on April 24, 2007. The Defendant filed a response in opposition on May 30, 2007. A reply brief was submitted by the plaintiff on June 12, 2007. For the reasons set forth below, the motion is denied.

I.      <u>BACKGROUND</u>

During the night of July 2, 2004, the plaintiff, Cindy Magelky, was a conductor on a two-person crew operating a coal train for the Burlington Northern and Santa Fe Railway Company (BNSF). The train departed Mandan, North Dakota, at approximately 11:30 p.m. on July 2, 2004, and was headed to Dilworth, Minnesota. At about 12:15 a.m., just outside of Bismarck, the train lost air pressure and came to an emergency stop which indicated a separation at some point in the 100-plus car train.[1] After engineer Doug Allen attempted to

_____

[1]An emergency stop occurs when the continuity of air flow from the air hoses between the cars of the train is broken.

reset the air without success, he directed Magelky to climb off the lead engine and walk back to determine the point of separation. Magelky contends that as she walked west along the train and before she reached the point of separation, she slipped and fell. <u>See</u> Docket No. 21, ¶ 15, and Deposition of Magelky, Docket No. 29-3, pp. 5-9.

Magelky contends that she slipped and fell when she was walking within arm's distance of the rail cars going to the west. Magelky contends that she slipped four feet down the slope of the rack bed due to a lack of a walkway and sloping mainline ballast and was injured. <u>See</u> Deposition of Magelky, Docket No. 29-3, pp. 199-201. Magelky also contends that her injuries caused her to be permanently disabled. <u>See</u> Docket No. 1. There were no eyewitnesses to the fall.

Magelky claims that before she got up from her fall, engineer Allen called to determine if she had found the problem. Magelky claims that she did not reply right away because she was still in the process of standing up, but when she got up she told Allen that she had not yet found the problem. <u>See</u> Deposition of Magelky, Docket No. 29-3, pp. 202-203. When Allen asked how far she was into the train, Magelky testified that she said, "I just fell but I lost count, but it's approximately 50, but I had lost count at that point." <u>Id.</u>

It is unclear from the record when Magelky actually reported the fall. Engineer Allen does not recall when Magelky reported the fall. <u>See</u> Deposition of Allen, Docket No. 29-4, pp. 28-31. The dispatchers's radio log indicates the fall was not reported by Allen to the dispatcher until after the knuckle was replaced and the train put back together. <u>See</u> Docket No. 29-5, pp. 21-22. The dispatcher's radio log indicates that there was confusion about whether the fall happened when Magelky was looking for the separation or when she returned

2

to the locomotive after the knuckle had been replaced.  <u>See</u> Docket No. 29-5, pp. 22, 28, 33.

Railroad cars in a train are connected by couplers located at both ends of the car.  Each rail car has a coupling mechanism which allows the cars to be connected with other cars.  The standard coupling mechanism consists of a "knuckle" joined in the end by a drawbar, which itself is fastened to a housing mechanism on the car.  The knuckle is a clamp that can be opened and closed as required, and is designed to couple automatically with another knuckle on impact.  When cars come together the open knuckle on one car engages a closed knuckle on the other car automatically coupling the cars.  In this case, it appears that there was a crack in one of the knuckles which caused it to malfunction thereby causing the emergency stop.

Magelky testified that after her fall she continued to inspect the cars and eventually heard air, knowing that to be an indication of a broken coupler.  Magelky then inspected the west side of one coal car and noticed that a coupler knuckle was broken.  Magelky then reported to Allen and the dispatcher that she had found a broken coupler and that she had "never changed a knuckle before."  <u>See</u> Deposition of Magelky, Docket No. 29-3, pp. 204-206.  According to BNSF, Magelky did not advise either the dispatcher or engineer Allen that she was physically unable to continue working or that she needed medical assistance.

Because Magelky had never changed a knuckle before, the dispatcher requested that a carman from Mandan drive to the train to replace the knuckle.  <u>See</u> Docket No. 29-5, pp. 5-8.  Randy Lund arrived and replaced the knuckle.  <u>See</u> Deposition of Lund, Docket No. 29-6, pp. 46-54.  Magelky contends that she told Lund that she was injured and felt like she had been "hit by a train."  <u>See</u> Deposition of Magelky, Docket No. 29-3, pp. 210.  Lund testified that he was not advised by Magelky of an injury, and that he did not notice Magelky having

3

any problems in navigating or moving on her own.  <u>See</u> Deposition of Lund, Docket No. 29-6, pp. 46-54.  Magelky did not request a ride back to Mandan with Lund because of an injury.

After the train was coupled back together and Magelky's injury reported, dispatch summoned Rail Express driver Alvin Hanson to meet the train at Medina and pick up Magelky and drive her to Mandan so that she could go to the emergency room.  Magelky states that she told Hanson that she felt like she "had been hit by a train."  <u>See</u> Deposition of Magelky, Docket No. 29-3, pp. 210.  Hanson testified that Magelky had indicated that she had hurt her left hand, but did not recall Magelky stating that she felt like she had been hit by a train.  <u>See</u> Deposition of Hanson, Docket No. 29-7, pp. 16-20.

Hanson dropped Magelky off at the railroad terminal in Mandan and terminal manager Allan Marden then transported Magelky to the emergency room at Medcenter One in Bismarck.  Magelky reached the emergency room at 6:41 a.m.  Dr. Craig Lambrecht was notified at 6:45 a.m. and saw Magelky at 6:50 a.m.  Dr. Lambrecht examined Magelky and ordered x-rays which apparently revealed no evidence of fracture or dislocation of her right wrist and hip.  Dr. Lambrecht determined that Magelky had a right hip contusion and a right hand contusion and instructed her to take Advil or Tylenol for any pain.  <u>See</u> Docket No. 20-10.

According to BNSF, within two days of her fall, Magelky wrote to BNSF notifying them that her ex-husband Terry Berger was her designated union representative.  By July 7, 2004, Berger had contacted an attorney concerning medical releases for Magelky's records.  <u>See</u> Docket No. 29-8.  On July 7, 2004, Magelky went to the Q&R Clinic in Mandan

complaining of increased problems with pain.  See Docket No. 20-11.  Magelky contends that she is permanently disabled from her fall.  She has never returned to work at BNSF.

Magelky has asserted two claims in her complaint.  The first claim is based on the Federal Employers' Liability Act, 45 U.S.C. § 51 et. seq.  The second claim is based on the Federal Safety Appliance Act, 49 U.S.C. § 20301, et. seq.


## II.    STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999).  A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996).  The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact.  If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings.  Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e).  A mere trace of evidence supporting the non-movant's position is

insufficient.  Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.   LEGAL DISCUSSION

There are two federal statutes relevant to the motion before the Court.  The first statute is the Federal Employers Liability Act, 45 U.S.C. § 51 et. seq. ("FELA,") which was enacted in the 1930's.  FELA provides a cause of action to railroad employees for injuries "resulting in whole or in part from the negligence of [the railroad] ... or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, ... or other equipment."  45 U.S.C. § 51.  The Eighth Circuit has recognized that Congress intended FELA to be a broad statute designed to be liberally interpreted to fulfill the intent of Congress.  Hane v. Nat'l R.R. Passenger Corp., 110 F.3d 573, 574 (8th Cir. 1997).

FELA is a remedial statute grounded in negligence although the statute does not define negligence.  To prevail on a FELA claim, a plaintiff must generally prove the traditional common law components of negligence which include duty, breach of duty, causation, injury, and damages.  Adams v. CSX Transp., Inc., 899 F.2d 536, 539 (6th Cir. 1990).  This includes showing whether the  railroad failed to use reasonable or ordinary care under the circumstances.  Davis v. Burlington Northern, Inc., 541 F.2d 182, 185 (8th Cir. 1976).  The plaintiff's burden of proof in an FELA action is significantly lighter than it would be in an ordinary negligence case.  In an FELA action, the railroad is liable if its negligence played any part, even the slightest, in producing the injury.  Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 506 (1957).

6

FELA's most distinctive departure from the common law is in the area of causation. The plain language of 45 U.S.C. § 51 establishes a standard of "in whole or in part" causation which replaces the common law standard of proximate causation. In other words, to impose liability on the defendant, the negligence need not be the proximate cause of the injury. "The test of causation under the FELA is whether the railroad's negligence played any part, however small, in the injury which is the subject of the suit." Fletcher v. Union Pac. R. Co., 621 F.2d 902, 909 (8th Cir. 1981). It is clear that a plaintiff in a FELA action must establish negligence on the part of the railroad as a predicate to liability. Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542-544 (1994). Proof of an accident alone is not proof of negligence. Id. The Eighth Circuit has said that "[I]t is the jury's task to determine negligence under FELA." Hane v. Nat'l R.R. Passenger Corp., 110 F.3d 573, 574 (8th Cir. 1997).

In addition, it is well-established that under FELA, contributory negligence is not a bar to recovery. Instead, contributory negligence may only be used to proportionately reduce the plaintiff's damages. 45 U.S.C. § 53; Flanigan v. Burlington Northern, Inc., 632 F.2d 880 (8th Cir. 1980). However, if the negligence of the employee is the sole cause of any resulting injuries or death, there is no liability because the railroad did not cause or contribute to cause the employee's injury or death. New York Cent. R. Co. v. Marcone, 281 U.S. 345, 350 (1930); Meyers v. Union Pac. R. Co., 738 F.2d 328, 331 (8th Cir. 1984). It must also be kept in mind that the provisions of 45 U.S.C. § 51 which establish a negligence cause of action under FELA do not establish absolute liability. "[T]he Federal Act does not make the railroad an absolute insurer against personal injury damages suffered by its employees." Wilkerson

v. McCarthy, 336 U.S. 53, 61 (1949). In other words, FELA imposes liability only for negligent injuries. FELA was essentially enacted to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or their fellow employees. FELA was not designed to create new substantive torts, but instead was designed to protect railway workers in federal court from common-law torts.

In addition to a negligence cause of action under 45 U.S.C. § 51, FELA also provides for certain causes of action which are not based upon negligence. These are actions brought under FELA for injuries caused by the railroad's violation of the Federal Safety Appliance Act. 49 U.S.C. §§ 20301 et. seq. This Act is the second federal statute relevant to the pending motion. The Federal Safety Appliance Act (FSAA) does not create a private cause of action, but employees who allege they have been injured as a result of FSAA violations may sue under FELA. See Crane v. Cedar Rapids & Iowa City Ry. Co., 395 U.S. 164, 166 (1969). In other words, FELA embraces claims of an employee based on violations of the Federal Safety Appliance Act. In some cases, the same facts which give rise to a claim under the general negligence provisions of FELA may also provide a basis for a related claim under the Federal Safety Appliance Act. Nevertheless, while the same facts may give rise to a combination of FELA claims, the elements of a FELA negligence claim are separate and distinct from those of a claim brought under the Federal Safety Appliance Act.

With respect to the Federal Safety Appliance Act, certain railroad equipment must be kept in certain prescribed conditions. If the equipment is not kept in the prescribed conditions and an employee is injured, the employee may bring a cause of action under FELA. In such cases, proof of the violation of the Federal Safety Appliance Act supplies "the wrongful act

necessary to ground liability under the F.E.L.A." <u>Carter v. Atlanta and St. Andrews Bay Ry.</u> <u>Co.</u>, 338 U.S. 430, 434 (1949). In personal injury claims brought for injuries caused by a violation of the Federal Safety Appliance Act, care on the part of the railroad is, as a general rule, immaterial. The United States Supreme Court "early swept all issues of negligence out of cases under the Safety Appliance Act." <u>O'Donnell v. Elgin J. & E. Ry. Co.</u>, 338 U.S. 384, 390 (1949). However, if the plaintiff's negligence was the sole cause of the injury or death, then the statutory violation could not have contributed "in whole or in part" to the injury or death. <u>Beimert v. Burlington Northern, Inc.</u>, 726 F.2d 412, 414 (8th Cir. 1984). Despite the differences between these types of claims, the claims are often intermingled. In order to avoid such mingling, it is clear that claims brought under the general negligence provisions of FELA, and claims brought under the Federal Safety Appliance Act, should be submitted to the jury in separate instructions.

### A.      THE FEDERAL SAFETY APPLIANCE ACT

Magelky first claims that a broken coupler is a per se or automatic violation of the Federal Safety Appliance Act (FSAA) as a matter of law. In support of her contention, Magelky cites <u>O'Donnell v. Elgin, J. & E. Ry. Co.</u>, 338 U.S. 382 (1949). In <u>O'Donnell</u>, a switchman went to adjust the couplers on certain cars that had previously failed to couple by impact. Shortly after the switchman went to adjust the couplers, a separate coupler broke causing two cars to break free and collide with other standing cars. The collision drove the standing cars into the cars the switchman was working on, resulting in the switchman's death.

In interpreting the then applicable Safety Appliance Act, 45 U.S.C. § 2,[2] the Supreme Court held that "the Safety Appliance Act requires couplers which, after a secure coupling is effected, will remain coupled until set free by some purposeful act of control." Id. at 388.

BNSF contends that the holding of O'Donnell is not as broad as its language suggests and cites to Porter v. Bangor & Aroostook R.R. Co., 75 F.3d 70 (1st Cir. 1996) and Norfolk and W. Ry. Co. v. Hiles, 516 U.S. 400 (1996). In Porter, the First Circuit held as a matter of law that the defendant railroad had not violated the FSAA even though the plaintiff strained his back while working on defective coupler equipment. In reaching this conclusion, the First Circuit discounted the existence of the defective coupler and looked to the actions of the plaintiff, stating that "readying is not coupling, and does not involve the special coupling risks." Porter, 75 F.3d at 71.

In Norfolk, a misaligned drawbar precluded a train from automatically coupling and a railroad employee was injured after he went between the cars to straighten the drawbar. The Supreme Court rejected a claim that the railroad was liable as a matter of law under the FSAA

_____

[2] The statute in O'Donnell, 45 U.S.C. § 2, was repealed in 1994. The statute provided that:

It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

45 U.S.C. § 2 (1994), repealed by Pub. L. 103-272, § 7(b), 108 Stat. 1379. The current version of the statute was codified at 49 U.S.C. § 20302(a)(1)(A) and provides:

(a) General.--Except as provided in subsection (c) of this section and section 20303 of this title, a railroad carrier may use or allow to be used on any of its railroad lines--
(1) a vehicle only if it is equipped with--
(A) couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles;

49 U.S.C.A. § 20302(a)(1)(A) (2005).

10

for the injuries suffered. The Supreme Court noted that the train did not have a defective coupler that prevented automatic coupling upon impact as required under the FSAA, but rather had a misaligned drawbar.  The Supreme Court noted that the language of the FSAA only required a coupler with certain attributes and refused to adopt the plaintiff's reasoning and expand the interpretation of the FSAA to include a drawbar requirement. However, <u>Norfolk</u> is distinguishable in that the defective component was a drawbar and, unlike a coupler, is not regulated by the FSAA.

Suffice it to say that after a lengthy review of numerous federal cases interpreting the Act's application to defective equipment, the Court is convinced that the malfunctioning and misalignment of rail car couplers has received varied and often inconsistent treatment from federal courts over the years.  While the First Circuit in <u>Porter</u> does attempt to narrow the holding in <u>O'Donnell</u>, the case does not overrule <u>O'Donnell</u> nor is the First Circuit decision binding in this district.  Absent a Supreme Court case which expressly overrules <u>O'Donnell</u> or a statutory amendment, this Court is bound by existing Supreme Court precedent.  In <u>O'Donnell</u>, the Supreme Court held that the Federal Safety Appliance Act requires that certain railroad equipment (couplers) withstand the stress of ordinary operations, and that a railroad cannot escape liability for a coupler's inadequacies.  338 U.S. 382, 393-394.  Even if the railroad can explain away its negligence by showing it conducted regular inspections of the couplers or that there were no visible defects, it may not be enough to explain away its liability if the Act has been violated.  <u>Id.</u>

Notwithstanding the apparent state of the law as to liability for a broken coupler under the Federal Safety Appliance Act, the Court is reluctant to grant partial summary judgment

on the issue of liability at this preliminary stage of the proceedings.  Based on the limited facts presented to date, the Court is not prepared at this stage to hold, as a matter of law, that a broken coupler constitutes an automatic, per se violation of the Act which imposes absolute liability upon a railroad for injuries sustained by an employee when the automatic couplers fail to perform properly.  Although the holding in O'Donnell is broad and arguably appears to be the law that may ultimately govern the facts of this case, the Court needs to hear the evidence before a determinative ruling is made.   The Court and the parties would benefit from a more complete record.

       In addition to the FSAA claim, Magelky has alleged a negligence claim under the Federal Employer's Liability Act (FELA) which requires that elements of duty, breach of duty, causation, and damages be established.  The presentation of evidence to support the FELA claim will necessarily include a presentation of evidence relating to the failure of the coupler.  A resolution of the issue of liability under the Federal Safety Appliance Act can be addressed following the presentation of the evidence at trial, it can be addressed in the Court's jury instructions, and/or in Rule 50 motions for judgment as a matter of law made at any time before the case is submitted to the jury or made after trial.  Simply stated, at this stage of the litigation, there is an incomplete record and a number of disputed issues of material fact that preclude the granting of partial summary judgment on the issue of liability under the Federal Safety Appliance Act.  The Court denies the plaintiff's motion for partial summary judgment.

**B.**     **CAUSATION**

Magelky also contends that there are no genuine issues of material fact as to causation because if the coupler had not broken, the train would not have stopped, Magelky would not have had to leave the cab to inspect the train, and she would not have fallen and been injured.

It is well-established that if there is any doubt, issues of causation should be submitted to the jury and not decided as a matter of law.  See Richards v. Consolidated Rail Corp., 330 F.3d 428 (6th Cir. 2003) (discussing the long-line of Supreme Court cases which conclude that the issue of causation in either FELA or FSAA cases should be submitted to the jury). The record reveals a number of conflicting facts concerning whether Magelky slipped and fell before or after the knuckle was changed.  As a practical matter, it may make no difference whether the fall occurred when Magelky was going to or returning from the rail car with a broken knuckle/coupler if a violation of the FSAA occurred.  However, the Court and the jury need to hear the evidence.  There are disputed factual issues concerning whether a "slip-and-fall" even occurred.  Although the medical records arguably support the fact that some type of fall occurred on July 3, 2004, resulting in minor injuries, BNSF has indicated that there will be testimony from several witnesses whom Magelky allegedly told that before she (Magelky) ever quit or was fired from the railroad, she would make sure she got hurt and received a large monetary settlement.  Such evidence would be relevant and admissible at trial regardless of whether the testimony is suspicious or arises out of a long history of contentious litigation between Magelky and her former husband and in-laws.  Whether such testimony is credible is for the jury to assess rather than the judge.  It is clear from the limited record before the Court that there are genuine issues of material fact concerning the circumstances of the "slip-

13

and-fall" on July 3, 2004, when and how and whether the fall occurred, when and how and to whom the fall was reported, what information was reported by Magelky concerning the fall, the nature and extent of the injuries allegedly sustained from the slip-and-fall, and other disputed factual issues concerning causation and damages. In summary, there are a multitude of disputed factual issues as to liability, causation, and damages which preclude the granting of partial summary judgment at this preliminary stage.

**IV.**     **CONCLUSION**

For the reasons set forth above, the Court **DENIES** the Plaintiff's Motion for Partial Summary Judgment (Docket No. 17). There are a multitude of disputed factual issues on liability, causation, and damages under both the Federal Safety Appliance Act and the Federal Employer's Liability Act that warrant a jury trial and preclude the granting of partial summary judgment.

**IT IS SO ORDERED.**

Dated this 14th day of June, 2007.

/s/ Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court

14